IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MORTGAGE BANKERS ASSOCIATION,                )
                                              )
            Plaintiff,                        )   Civ. No. 1:11-cv-73
                                              )          (RBW)
      v.                                      )
                                              )
HILDA SOLIS, Secretary of Labor;              )
NANCY LEPPINK, Acting Wage and Hour Administrator; and   )
THE UNITED STATES DEPARTMENT OF LABOR,        )
                                              )
            Defendants.                       )
_____)

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Date: May 17, 2011                          Respectfully submitted,

TONY WEST                                   /s/ Peter D. Leary
Assistant Attorney General                  PETER D. LEARY
RONALD C. MACHEN, JR.                        Virginia Bar No. 71196
United States Attorney                       Trial Attorney, Federal Programs Branch
FELIX V. BAXTER                              U.S. Department of Justice, Civil Division
Director, Federal Programs Branch           Tel: (202) 514-3313
JUDRY L. SUBAR                               Fax: (202) 616-8470
Assistant Director,                         E-mail: peter.leary@usdoj.gov
Federal Programs Branch                     Mailing Address:
                                            Post Office Box 883
                                            Washington, D.C. 20044
Of Counsel:

M. PATRICIA SMITH
Solicitor of Labor
JENNIFER S. BRAND
Associate Solicitor
JONATHAN M. KRONHEIM
Counsel for Trial Litigation
RACHEL GOLDBERG
Attorney
U.S. Department of Labor

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................... 1

ARGUMENT.......................................................................................................................... 2

I.      The Secretary Was Not Required to Provide Notice and Comment Before
        Issuing the 2010 AI. .............................................................................................. 2

        A.      The MetWest Exception Applies to This Case. ....................................... 2

        B.      The Monmouth Exception Applies to This Case. ..................................... 6

        C.      Plaintiff Has Failed to Reconcile the Paralyzed Veterans Doctrine with
                the APA or Supreme Court Precedent Because Reconciliation Is
                Impossible. ............................................................................................. 9

II.     The 2010 AI is Plainly Consistent with the 2004 Regulations. ........................... 14

        A.      The 2010 AI Is Consistent with the Financial Services Example in
                Section 541.203(b) of the 2004 Regulations........................................... 14

        B.      The 2010 AI Addresses and Is Consistent with Wilshin. ...................... 15

        C.      The 2010 AI and the 2004 Regulations Apply the Same "Primary Duty"
                Analysis.................................................................................................. 17

        D.      Casas Is Both a Key Underpinning of the 2010 AI and Tellingly Absent
                from the 2006 Opinion Letter. ............................................................... 19

CONCLUSION...................................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Alaska Professional Hunters Association, Inc. v. FAA*,
177 F.3d 1030 (D.C. Cir. 1999). ................................................................ passim

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008). ............................................................ 19

*American Mining Congress v. Mine Safety & Health Administration*,
995 F.2d 1106 (D.C. Cir. 1993). ................................................... 7, 8, 13

*Ass'n of Am. R.R.s v. DOT*,
198 F.3d 944 (D.C. Cir. 1999). ............................................................ 4

*Auer v. Robbins*,
519 U.S. 452 (1997). ........................................................................ 14

*Casas v. Conseco Fin. Corp., No. Civ. 00-1512 (JRT/SRN)*,
2002 WL 507059 (D. Minn. Mar. 31, 2002)............................... 17, 20, 21

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)........................................................................ 19

*Cottage Health Sys. v. Sebelius*,
631 F. Supp. 2d 80 (D.D.C. 2009). ..................................................... 3

*FCC v. Fox Television Stations, Inc.*,
129 S. Ct. 1800 (2009)........................................................... 9, 10, 13, 14

*Henry v. Quicken Loans, Inc.*,
No. 2:04-cv-40346-SJM-MJH (E.D. Mich. Jan. 27, 2011). ................ 18, 19

*Hogan v. Allstate Insurance Co.*,
361 F.3d 621 (11th Cir. 2004). ...................................................... 17, 20

*Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*,
628 F.3d 568 (D.C. Cir. 2010). ........................................................... 3

*IMS, P.C. v. Alvarez*,
129 F.3d 618 (D.C. Cir. 1997). ......................................................... 19

ii

*Long Island Care at Home, Ltd. V. Coke,*
    551 U.S. 158 (2007)................................................................. 13

*Marcum v. Salazar,*
    751 F. Supp. 2d 74 (D.D.C. 2010). ......................................... 19

*MetWest Inc. v. Sec'y of Labor,*
    560 F.3d 506 (D.C. Cir. 2009). ..................................... 2, 3, 4, 5

*Monmouth Medical Center v. Thompson,*
    257 F.3d 807 (D.C. Cir. 2001). ......................................... 6, 7, 8

*National Family Planning & Reproductive Health Association v. Sullivan,*
    979 F.2d 227 (D.C. Cir. 1992). ............................................... 13

*Paralyzed Veterans of America v. D.C. Arena L.P.,*
    117 F.3d 579 (D.C. Cir. 1997). ......................................... passim

*Reich v. John Alden Life Ins. Co.,*
    126 F.3d 1 (1st Cir. 1997). ............................................... 17, 20

*Rust v. Sullivan,*
    500 U.S. 173 (1991)................................................................. 13

*Shalala v. Guernsey Memorial Hospital,*
    514 U.S. 87 (1995)............................................................. 11, 12

*Udall v. Tallman,*
    380 U.S. 1 (1965). ................................................................... 14

*United States v. Torres,*
    115 F.3d 1033 (D.C. Cir. 1997). ............................................... 9

*Vermont Yankee Nuclear Power Corp. v. NRDC,*
    435 U.S. 519 (1978)................................................ 9, 10, 11, 13, 14

*Wilshin v. Allstate Ins. Co.,*
    212 F. Supp. 2d 1360 (M.D. Ga. 2002). .......................... 15, 16, 17, 20

## STATUTES

29 C.F.R. § 541.2................................................................... 17, 21

29 C.F.R. § 541.200(a)  ............................................................. 15

iii

29 C.F.R. § 541.203(b). ...................................................................................... 15, 20

29 C.F.R. §§ 541.500-541.504.................................................................................. 18

69 Fed. Reg. 22122 (Apr. 23, 2004) (codified at 29 C.F.R. Part 541)............................ 15, 16, 18

5 U.S.C. § 551(5). ................................................................................................ 11, 12

5 U.S.C. § 553...................................................................................................... 10, 12

5 U.S.C. § 553(b). ........................................................................................ 1, 8, 9, 11, 12

5 U.S.C. § 706 ...................................................................................................... 19

Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§201-219. ................................ 1

Portal-to-Portal Act of 1947 (29 U.S.C. 259(a))........................................................ 6

## OTHER

William Funk, A Primer on Nonlegislative Rules, 53 Admin. L. Rev. 1321
    (2001). .......................................................................................................... 11

William S. Jordan III, News from the Circuits, 29 Admin. & Reg. L. News 19 (Fall, 2003). ..... 11

Richard W. Murphy, Hunters for Administrative Common Law, 58 Admin. L. Rev.
    917 (2006)....................................................................................................... 11

Note, 101 Colum. L. Rev. 155 (2001). ...................................................................... 10

Richard J. Pierce, Jr., Distinguishing Legislative Rules from Interpretative Rules, 52
    Admin. L. Rev. 547 (2000)................................................................... 8, 11, 12, 13

Richard J. Pierce, Jr., Administrative Law Treatise (4th ed. 2002.) 347. ....................... 11

**INTRODUCTION**

The Administrative Procedure Act (APA), which generally requires agency rules to be issued only after notice and an opportunity for public comment, expressly exempts interpretive rules from that requirement.  5 U.S.C. § 553(b)(A).  And although the D.C. Court of Appeals first stated in *dicta* that § 553(b)(A) should not apply to a rule that reinterprets an earlier agency rule, <u>Paralyzed Veterans of America v. D.C. Arena L.P.</u>, 117 F.3d 579, 586 (D.C. Cir. 1997), not only is the "<u>Paralyzed Veterans</u> doctrine" subject to numerous exceptions, but multiple Supreme Court decisions make clear that the doctrine cannot be operative law.  Yet Plaintiff, the Mortgage Bankers Association (MBA), continues to seek invalidation of the 2010 Administrator's Interpretation (AI) issued by the Department of Labor (DOL) which explained that mortgage loan officers are not exempt from the overtime protections provided by the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219.

Rather than tackle the issues raised in Defendants' dispositive motion, Plaintiff spends the first half of its opposition brief dodging the tough questions.  Not once does MBA try to explain why § 553(b)(A), which expressly exempts interpretive rules from notice and comment requirements, does not dispose of this lawsuit.  Nor does MBA grapple with the flawed reasoning that permeates <u>Paralyzed Veterans</u> or the valid criticisms numerous courts and academics have leveled against the case.  And MBA never comes to grips with the fact that since issuing <u>Paralyzed Veterans</u>, the D.C. Circuit has spent 14 years creating exception after exception to its doctrine.  To the extent that MBA does address the doctrinal exceptions Defendants raised, it misunderstands one and mischaracterizes the other; nevertheless, both are applicable.  The first exception applies because Plaintiff has not shown sufficiently substantial or justifiable reliance on the earlier interpretation in question, while the second exception applies because the earlier

interpretation was invalid.  Accordingly, notice and comment were not required before DOL issued the 2010 AI.

MBA's contention that the 2010 AI should be invalidated on its merits, on which it bears a particularly heavy burden, fares no better.  The 2010 AI is plainly consistent with the 2004 regulations it was designed to interpret, in clear contrast to the 2006 Opinion Letter it revoked. Plaintiff's arguments that DOL applied the wrong test or reached the wrong answer when it determined that a typical mortgage loan officer's primary duty is to produce a product—sales of his company's loans—are unconvincing.  DOL's analysis and conclusion were entirely consistent with the FLSA and its own regulations.  By contrast, the 2006 Opinion Letter, which MBA so zealously defends, was in clear violation of the regulations, failing even to consider one of the key cases upon which the regulations relied.

For the foregoing reasons, set forth further below and in Defendants' Cross Motion to Dismiss or, in the Alternative, for Summary Judgment, the Court should dismiss this case or, in the alternative, grant Defendants summary judgment.

## ARGUMENT

### I.    The Secretary Was Not Required to Provide Notice and Comment Before Issuing the 2010 AI

#### A.    The <u>MetWest</u> Exception Applies to This Case

<u>Paralyzed Veterans</u> does not apply to a case, such as this, in which an affected party's reliance upon a prior interpretation was not both "substantial and justifiable." <u>MetWest Inc. v. Sec'y of Labor</u>, 560 F.3d 506, 511 (D.C. Cir. 2009).  Plaintiff is correct that the <u>MetWest</u> court dealt with an informal interpretation and held that "conditional or qualified statements, including

statements that something 'may be' permitted, do not establish definitive and authoritative interpretations" that would invoke the <u>Paralyzed Veterans</u> doctrine. <u>Id.</u> at 509-10. But <u>MetWest</u> was not limited to that holding, and MBA is wrong that the court there was simply "defining when an *informal* OSHA interpretation can become a *definitive* interpretation [.]" Pl's. Opp'n (Doc. 17) at 16 (alteration in original). Rather, the D.C. Circuit clarified in <u>MetWest</u> that an affected party's "substantial and justifiable" reliance upon a prior interpretation is an independent consideration necessary to trigger the <u>Paralyzed Veterans</u> doctrine, regardless of the precise nature of the original interpretation in question. <u>MetWest</u>, 560 F.3d at 511. The D.C. Circuit acknowledged as much last December, evaluating whether a regulated party's reliance on an agency's interpretation was substantial and justifiable regardless of whether the interpretation was definitive or not. <u>See</u> <u>Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n</u>, 628 F.3d 568, 579-80 (D.C. Cir. 2010); <u>see also</u> <u>Cottage Health Sys. v. Sebelius</u>, 631 F. Supp. 2d 80, 97 (D.D.C. 2009) ("[A] recent case [<u>MetWest</u>] has clarified that a change to a prior interpretive rule only requires notice and comment rulemaking when parties relied on the prior interpretation substantially and justifiably.").

In order to properly understand the meaning of the <u>MetWest</u> exception, one must fully comprehend the unique interest that the D.C. Circuit sought to protect in <u>Alaska Professional Hunters Association, Inc. v. FAA</u>, 177 F.3d 1030 (D.C. Cir. 1999).[1] In that case, the D.C. Circuit concluded that notice and comment were required before the Federal Aviation Administration (FAA) could reverse a three decades-old practice by the agency's regional office of exempting

---

[1] <u>MetWest</u> was written by Judge A. Raymond Randolph, the author of <u>Alaska Professional Hunters</u>.

guide pilots from commercial flight regulations.  See id. at 1035-36.  There, "[p]eople in the lower 48 states had pulled up stakes and moved to Alaska.  They and others within Alaska had opened hunting and fishing lodges and built up businesses dependent on aircraft" based on an agency's interpretation.  MetWest, 560 F.3d at 511 (quotations omitted).  As a result, the D.C. Circuit was deeply concerned about the ruinous effect the FAA's change in interpretation would have.  Id. ("Forcing guide pilots to comply with regulations developed for commercial airlines would have driven Alaska's hunting and fishing tourism operations out of business.").  In other words, the regulated parties in Alaska Professional Hunters had relied so substantially and so justifiably on an agency's interpretation that a sudden change inevitably would have led to catastrophic harm.  This concern was a "fundamental rationale" of the court and a "crucial part" of its ruling that notice and comment were required.  Id. at 511 & n.4.  But there are a vanishingly small number of cases comparable to the situation in Alaska Professional Hunters, which is presumably one of the main reasons why it is the only time the D.C. Circuit has ever relied on the Paralyzed Veterans doctrine to find a true interpretive rule invalid for lack of notice and comment.[2]  See, e.g., Ass'n of Am. R.R.s v. DOT, 198 F.3d 944, 950 (D.C. Cir. 1999) ("Nothing in this record suggests that [the plaintiffs] relied on [agency guidance] . . . in any comparable way" to the petitioners in Alaska Professional Hunters because they had not "made large capital expenditures based on their interpretation . . . or altered their business practices in

---

[2] MBA trumpets that Paralyzed Veterans has "been cited repeatedly by the D.C. Circuit," Pl's. Opp'n at 9, but then cites a string of cases, none of which actually applies the doctrine. While the D.C. Circuit may mention the doctrine from time to time, with the exception of Alaska Professional Hunters, it has never applied it (not even in Paralyzed Veterans itself).  Defendants previously noted this fact, see Defs'. Cross Mot. to Dismiss or, in the Alternative, for Summ. J. at 17, and MBA has not refuted it.

any significant manner.").

The contrast between <u>Alaska Professional Hunters</u> and the present matter is stark.  In the former, people uprooted their lives, moved across the country, and spent 30 years building up an entire industry in particularly substantial and justifiable reliance on an agency interpretation.  It was reliance of this enormous magnitude, and the inevitable harm that would have resulted from a change in interpretation without notice and comment, that stirred the D.C. Circuit to act. Plaintiff cannot seriously match its alleged reliance or alleged harm against that record, and their attempts to do so fall well short of meeting their burden.  In terms of reliance, at most MBA and its members operated under the misapprehension that mortgage loan officers were administratively exempt for four years,[3] and structured their pay systems accordingly, before DOL corrected that error.  Plaintiff has not shown that any continents were traversed based on the 2006 Opinion Letters, nor that statewide economies sprung up in reliance on it, and thirty years did not elapse before the interpretation was replaced.  Nor has MBA shown any harm that it or its members[4] have allegedly suffered resulting from their reliance on the 2006 Opinion Letter that remotely resembles the potential devastation to the regulated sector of the economy described in

_____

[3] At one point, MBA implies that its members might have believed that mortgage loan officers were administratively exempt since 2001.  Pl's. Opp'n at 21-22.  Any such understanding would have been an obvious mistake, as the Wage and Hour Division had issued Opinion Letters in 1999 and 2001 concluding that mortgage loan officers were *not* administratively exempt.  <u>See</u> Opinion Letter, 1999 WL 1002401 (May 17, 1999) ("1999 Opinion Letter"), AR at 5; Opinion Letter, 2001 WL 1558764 (Feb. 16, 2001) ("2001 Opinion Letter"), AR at 6.  Nothing changed when DOL issued the 2004 regulations – in fact, those regulations confirmed the mortgage loan officers were not exempt.  Presumably it was this clarity of non-exemption that led Plaintiff to seek an different interpretation from DOL in 2006.

[4] MBA's discussion of speculative harm to consumers, Pl's. Opp'n at 20-21, which is questionable at best, is in any event inappropriate.  <u>MetWest</u> was concerned with the substantial and justifiable reliance of regulated entities, not third parties.

Alaska Professional Hunters.[5]  Indeed, it is impossible for Plaintiff to maintain the position that

its members enjoy "an absolute defense to liability" from lawsuits related to good faith reliance

on the 2006 Opinion Letter because of the safe harbor provision of the Portal-to-Portal Act of

1947 (29 U.S.C.  259(a)), Pl's. Opp'n at 4, and simultaneously argue that MBA is similarly

situated to the petitioners in Alaska Professional Hunters, who had no such potential safety net

for their 30 years of justifiable reliance.

     Simply put, the record here does not demonstrate that Plaintiff has shown sufficiently

substantial or justifiable reliance to warrant application of Paralyzed Veterans.

### B.     The Monmouth Exception Applies to This Case

     The exception to the Paralyzed Veterans doctrine announced in Monmouth Medical

Center v. Thompson, 257 F.3d 807 (D.C. Cir. 2001) is straightforward: "under the law of this

circuit altering an interpretive rule (interpreting an agency regulation) requires notice and

opportunity for comment unless, of course, the original interpretation was invalid and therefore a

nullity."  Id. at 813-14.  Plaintiff, however, adds a requirement to the Monmouth exception never

mentioned by the D.C. Circuit – that the original interpretation must have been "repeatedly []

held invalid by reviewing courts."  Pl's. Opp'n at 3.  But nowhere in Monmouth did the D.C.

Circuit require that an original interpretation must have been declared invalid by a court before

an agency could replace an interpretation that the agency itself determined to be invalid.

Accordingly, MBA's criticism that "Defendants do not cite a single court decision issued *before*

---

[5] Respectfully, the freedom that mortgage loan officers enjoyed to take coffee breaks
when they wished as a result of the 2006 Opinion Letter, and the "harm" they allegedly incurred
when the 2010 AI cost them that "right," see Pl's. Opp'n at 23, is in no way comparable to the
reliance of the petitioners in Alaska Professional Hunters.

the AI was promulgated – let alone a consistent set of four court of appeals decisions – striking down the 2006 Opinion Letter" (Pl's. Opp'n at 11, alteration in original) rings hollow.[6]  There was nothing improper about DOL noting the invalidity of the 2006 interpretation in its publication of the 2010 AI, acknowledging that the 2006 Opinion Letter was contrary to the 2004 regulations and therefore a nullity.  To the contrary, given the invalidity of the original interpretation, the <u>Monmouth</u> exception makes clear that notice and comment were not required before DOL issued the 2010 AI.

Indeed, the requirement invented by Plaintiff—that agencies continue to enforce improper readings of their regulations until a member of the public gets around to suing, the Government defends the illegitimate interpretation, and a court rules against the Government—would make little sense legally or practically.  Either an interpretation is invalid, like the 2006 Opinion Letter, and therefore a nullity, or it is not.  Plus, it would serve no value to require an agency to continue to apply an invalid interpretation simply because a court has not issued an order declaring it as such yet.[7]  The D.C. Circuit dealt with a similar policy consideration in <u>American Mining Congress v. Mine Safety & Health Administration (MSHA)</u>, 995 F.2d 1106 (D.C. Cir. 1993).  In that case, MSHA issued three different rules over the course of time—without notice and

---

[6] Similarly, Plaintiff's attempt to take Defendants to task for supposed "reliance" on <u>Quicken Loans</u> to establish that the 2006 Opinion Letter had been declared invalid by a court prior to the agency's issuance of the 2010 AI is entirely off the mark, as no such prior declaration of judicial invalidity was necessary.  Defendants merely highlighted some of the well-founded points made by the court there.  Those observations remain valid whether or not the <u>Quicken Loans</u> court found the 2006 interpretation invalid before DOL did.

[7] The D.C. Circuit in <u>Monmouth</u> noted that "[a]s a *general* rule, it is for the courts to determine whether or not a regulation is invalid," 257 F.3d  at 814 (emphasis added), <u>but</u> it did not say that it was an *exclusive* rule.

7

comment—that interpreted a legislative rule which required mine operators to report every case of pneumoconiosis (a.k.a. black lung) "diagnosed." Id. at 1108. The third interpretive rule clearly amended the first rule by narrowing the circumstances in which certain x-ray readings required a report of a "diagnosed" case. Id. Facing a challenge that the agency had failed to follow notice and comment requirements, and after considering MSHA's sole defense of the interpretive rule exemption in § 553(b)(3)(A), the D.C. Circuit held the third interpretative rule was valid.[8] Id. at 1113. Not only is this the state of the law in this Circuit, but allowing an agency such flexibility makes good sense, since

> [i]t would be ludicrous to tell MSHA that it cannot correct the problem with the first interpretation without first conducting a notice and comment rulemaking. Giving MSHA, or any other agency, that message would discourage it from issuing any interpretative rules and would encourage it to adopt interpretations of its statutes and rules solely through the process of adjudication. That would disserve the interests of both agencies and all members of the public who are affected by agency interpretations of rules and statutes.

Richard J. Pierce, Jr., Distinguishing Legislative Rules from Interpretive Rules, 52 Admin. L. Rev. 547, 571 (2000). Because the 2006 Opinion Letter was invalid, the policy underpinnings of the Monmouth exception (manifested in American Mining Congress and articulated by Professor Pierce) provide ample support for the premise that Monmouth applies squarely to the 2010 AI.

---

[8] It is particularly noteworthy that in holding the third interpretive rule was valid, despite its having been issued without notice and comment and given that it altered an earlier interpretation, the D.C. Circuit necessarily held that an interpretive rule can amend a prior interpretive rule without notice and comment four years before it indicated to the contrary for the first time in Paralyzed Veterans.

**C.    Plaintiff Has Failed to Reconcile the <u>Paralyzed Veterans</u> Doctrine with the APA or Supreme Court Precedent Because Reconciliation Is Impossible**

Plaintiff's defense of the <u>Paralyzed Veterans</u> doctrine does nothing more than beg the question – it amounts to an argument that the doctrine must be right simply because the D.C. Circuit announced it.  And while Defendants acknowledge that "district judges . . . are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule[s] it," <u>United States v. Torres</u>, 115 F.3d 1033, 1036 (D.C. Cir. 1997), Plaintiff's approach allows MBA to ignore the text of the APA, the mistakes in <u>Paralyzed Veterans</u> and <u>Alaska Professional Hunters</u>, and the irreconcilability of those cases with <u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519 (1978) and <u>FCC v. Fox Television Stations, Inc.</u>, 129 S. Ct. 1800 (2009).  MBA's position does not stand up to scrutiny.

For starters, as previously mentioned, the section of the APA that governs agency rulemaking expressly exempts interpretative rules from notice and comment requirements.  <u>See</u> 5 U.S.C. § 553(b)(A) ("notice of proposed rule making . . . does not apply to interpretative rules.").  The clarity of this Congressional directive is no doubt why seven Courts of Appeals have agreed that changes in interpretations do not require notice and comment.  <u>See</u> Defs'. Cross Mot. to Dismiss or, in the Alternative, for Summ. J. at 16 n.9.  Plaintiff makes *no attempt* to explain why § 553(b)(A) does not entirely resolve the matter at hand, fundamentally because MBA cannot.

Instead, Plaintiff asserts that "<u>Paralyzed Veterans</u> and its progeny do not *add* to the procedural requirements of the APA."  Pl's. Opp'n at 5.  But given § 553(b)(A)'s clear instruction that interpretive rules are not subject to notice and comment requirements, that is *exactly* what <u>Paralyzed Veterans</u> and its progeny did.  And it is the clear imposition of this

additional procedural requirement which puts <u>Paralyzed Veterans</u> at odds with the Supreme

Court's admonition that, except in "extremely rare" circumstances, courts are "not free to

impose" any "additional procedural rights" beyond those set forth in the APA.  <u>Vermont Yankee</u>,

435 U.S. at 524.  The fact, emphasized by MBA, that <u>Vermont Yankee</u> was decided 20 years

before <u>Paralyzed Veterans</u> is of no moment.  In <u>Vermont Yankee</u>, the Supreme Court

unanimously held that § 553 "established the maximum procedural requirements which Congress

was willing to have the courts impose upon agencies in conducting rulemaking procedures" and

that by engrafting additional procedures, the D.C. Circuit had "seriously misread or misapplied . .

. statutory and decisional law"  <u>Id.</u> at 524-25.  The rule that courts may not add to the procedural

requirements established by the APA is as valid now as it ever was, and given the Supreme

Court's <u>Fox Television</u> decision, the continued application of <u>Paralyzed Veterans</u> (even by courts

in this Circuit) would not be appropriate.

Plaintiff then briefly attempts to justify the application of <u>Paralyzed Veterans</u> here not

only as a matter of *stare decisis* but also on the basis of sound APA analysis, going so far as to

state that "<u>Paralyzed Veterans</u> and its progeny . . . expressly base their holding on the APA's

statutory requirements."  Pl's. Opp'n at 5.  But MBA fails to provide any actual statutory support

for this assertion, and instead just restates the conclusions of <u>Paralyzed Veterans</u> which, along

with <u>Alaska Professional Hunters</u> has been criticized as a "mistake"[9] and a mutating "virus,"[10]

---

[9] Note, 101 Colum. L. Rev. 155, 163 (2001).

[10] William S. Jordan III, <u>News from the Circuits</u>, 29 Admin. & Reg. L. News 19, 20 (Fall, 2003).

which has "no support in statutes, case law, or reasoning,"[11] is "seem[ingly] flatly inconsistent

with <u>Vermont Yankee</u>"[12] and "should be abandoned."[13]   <u>See also</u> Richard W. Murphy, Hunters

for Administrative Common Law, 58 Admin. L. Rev. 917, 918 (2006) ("Academic commentary

on [<u>Alaska Professional Hunters</u>] has been scathing.").   The reasons for such overwhelming

condemnation are numerous and persuasive.

To begin with, as just explained, neither <u>Paralyzed Veterans</u> nor <u>Alaska Professional

Hunters</u> attempted to reconcile their approach with the plain language of § 553(b)(A) exempting

all interpretive rules from notice and comment, or to posit the existence of an "extremely rare"

circumstances that might justify an exception to <u>Vermont Yankee</u>.   But equally troubling is that

none of the three sources cited in <u>Paralyzed Veterans</u>—§ 551(5) of the APA, dicta from <u>Shalala

v. Guernsey Memorial Hospital</u>, 514 U.S. 87, 100 (1995), and two pages of a 1992 D.C. Circuit

opinion—actually supports the assertion that "agencies are obliged to engage in notice and

comment before formulating regulations, which applies as well to '*repeals*' or '*amendments*.'"

117 F.3d at 586.

Section 551(5) of the APA defines "rule making" as "agency process for formulating,

amending, or repealing a rule."  5 U.S.C. § 551(5).  "Section 551(5) says nothing, however, about

the procedure an agency must use to issue a rule."  Pierce, 52 Admin. L. Rev. at 567.  That

question is addressed in § 553, which expressly exempts interpretive rules from notice and

---

[11] Richard J. Pierce, Jr., <u>Distinguishing Legislative Rules from Interpretative Rules</u>, 52 Admin. L. Rev. 547, 573 (2000).

[12] William Funk, <u>A Primer on Nonlegislative Rules</u>, 53 Admin. L. Rev. 1321, 1329-1330 (2001).

[13] Richard J. Pierce, Jr., Administrative Law Treatise (4th ed. 2002.) 347.

comment.  Reading the two APA provisions together, it is clear that:

> [w]hen an agency issues, amends, or repeals a legislative rule, it must use the notice and comment procedure.  When it issues, amends, or repeals an interpretative rule, it is not required to use the notice and comment procedure. Every court that had addressed the issue, including the American Mining Congress Court, had reached that logical conclusion until the D.C. Circuit issued its decision in Paralyzed Veterans.

Id.[14]

The Paralyzed Veterans court also relied upon the statement in Guernsey that "APA rulemaking would still be required if [an interpretive rule] adopted a new position inconsistent with any of the Secretary's existing regulations."  514 U.S. at 100.  However, by "regulations," the Supreme Court plainly meant *legislative* regulations, not interpretive rules.  "Throughout its opinion, the [Supreme Court] distinguished between 'regulations' – its shorthand synonym for legislative rules – and 'interpretative rules.'"  Pierce, 52 Admin. L. Rev. at 568.  In addition, the context makes clear that the "regulations" to which the Supreme Court referred were the two applicable legislative regulations discussed at length earlier in the Guernsey opinion (514 U.S. at 91-97).  Thus, Guernsey supports only "the non-controversial proposition that an agency can only amend a legislative rule by issuing another legislative rule."  Pierce, 52 Admin. L. Rev. at 568. "At no point in its opinion in Guernsey, or in any other opinion, has the Supreme Court stated that an agency cannot amend an interpretative rule by issuing an interpretative rule."  Id.

The only other authority relied upon in Paralyzed Veterans for its new doctrine was a "see also" citation to National Family Planning & Reproductive Health Association v. Sullivan, 979

---

[14] Thus, far from supporting the rationale of Paralyzed Veterans, reading § 551(5) in combination with § 553 demolishes that doctrine.  Section 553(b)(A) specifies that notice and comment are not required for interpretive rules, and § 551(5) specifies that "interpretive rules" includes not only "formulating" new rules, but also "amending" or "repealing" existing rules.

F.2d 227, 240-41 (D.C. Cir. 1992).  That precedent does not support the <u>Paralyzed Veterans</u> doctrine because it merely held invalid an interpretive rule that was inconsistent with a prior legislative rule that had been upheld in <u>Rust v. Sullivan</u>, 500 U.S. 173 (1991), which prohibited federally funded family planning organizations from giving counseling concerning abortions. <u>See</u> Pierce, 52 Admin. L. Rev. at 568-69.  And many D.C. Circuit cases, including <u>American Mining Congress</u>, 995 F.2d at 1113, hold that an agency cannot amend a legislative rule without notice and comment.

Not having addressed the text of the APA, the relevance of <u>Vermont Yankee</u>, or the flaws in <u>Paralyzed Veterans</u>, Plaintiff concludes by making the sweeping statement that "[f]ar from somehow silently overruling <u>Paralyzed Veterans</u> and its progeny, <u>Fox Television</u> actually has no bearing at all on whether notice and comment are required."  Pl's. Opp'n at 8.  But in <u>Fox Television</u>, the Supreme Court held that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action."  <u>Fox Television</u>, 129 S. Ct. at 1811.  There is no way to read this holding and conclude that it is consistent with the <u>Paralyzed Veterans</u> doctrine, which expressly makes a distinction between an initial agency action and a subsequent agency action undoing or revising that action.[15]  What the D.C. Circuit said in <u>Paralyzed Veterans</u>, and did in <u>Alaska Professional Hunters</u>, is exactly what the Supreme Court has emphasized in <u>Fox Television</u> that courts should not do, and the fact that the Supreme Court has not yet overruled the doctrine does not mean it is any more valid.

---

[15] Likewise, Plaintiff's critique of <u>Long Island Care at Home, Ltd. v. Coke</u>, Pl's. Opp'n at 8 n.12, fails to address the key point made by the Supreme Court in that case: "under the Administrative Procedure Act an agency need not use [notice-and-comment procedures] when producing an 'interpretive' rule."  551 U.S. 158, 173 (2007).

In sum, an examination of the APA, <u>Paralyzed Veterans</u>, <u>Vermont Yankee</u>, and <u>Fox Television</u> leads to the inescapable conclusion that the <u>Paralyzed Veterans</u> doctrine cannot be reconciled with the APA or recent Supreme Court cases.  If this Court ultimately concludes that one of the numerous exceptions to the <u>Paralyzed Veterans</u> doctrine does not apply in this case, then the Court should conclude the <u>Paralyzed Veterans</u> doctrine not remain binding law in light of the Supreme Court's more recent caselaw.

## II.   The 2010 AI is Plainly Consistent with the 2004 Regulations

Plaintiff bears a particularly heavy (if unacknowledged) burden to persuade this Court that DOL's construction of the 2004 regulations is arbitrary and capricious.  <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation") (quotation omitted); <u>see also</u> <u>Udall v. Tallman</u>, 380 U.S. 1, 16 (1965) ("When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the . . . agency charged with its administration . . . . When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.").  That Plaintiff has not borne this burden is clear given that the 2010 AI is plainly consistent with the 2004 regulations, as Defendants previously demonstrated.  None of MBA's objections alter this equation.

### A.   The 2010 AI Is Consistent with the Financial Services Example in Section 541.203(b) of the 2004 Regulations

Contrary to Plaintiff's claims, Defendants have neither "adopt[ed] a new interpretation that contradicts the example in their 2004 regulations" nor "change[d] the regulatory example[]."

14

Pl's. Opp'n at 25-26.  As DOL has consistently explained, 29 C.F.R. § 541.203(b) offers

examples of how the administrative duties test contained in § 541.200(a) can be applied to

employees in various occupations, including when financial service industry employees generally

should or should not be considered administratively exempt.  See 69 Fed. Reg. 22122, 22144,

col.2 (Apr. 23, 2004) (codified at 29 C.F.R. Part 541), AR at 31 ("[S]ection 541.203 . . . includes

illustrations of the application of the administrative duties test to particular occupations.").  In so

doing, § 541.203(b) initially lists duties that an exempt financial services employee generally

would perform (e.g., marketing, servicing or promoting the employer's financial products), and

then identifies a duty that unvaryingly is disqualifying (having a primary duty of sales).  Applying

the general administrative duties test in § 541.200(a), in conjunction with the financial services

example in § 541.203(b), the 2010 AI analyzed the duties of a typical mortgage loan officer and

concluded the officer's primary duty was sales.  See 2010 AI at 4-7, AR at 105-08.  Nothing

about either test was altered; DOL's conclusion is entirely logical and consistent with 2004

regulations.  It should be sustained.

## B.    The 2010 AI Addresses and Is Consistent with Wilshin[16]

In its opening brief, MBA argued that the duties of a mortgage loan officer which the

2010 AI concluded were not exempt were "the very same duties" listed in § 541.203(b) as

exempt duties.  See Mem. in Supp. of Pl's. Mot. for Summ. J. at 26-28.  Defendants refuted that

assertion, explaining it was factually incorrect and improperly considered the mortgage loan

officers' duties in a vacuum.  See Defs'. Cross Mot. to Dismiss or, in the Alternative, for Summ.

J. at 32-34.  Not to be dissuaded, Plaintiff advances essentially the same argument with no new

---

[16] Wilshin v. Allstate Ins. Co., 212 F. Supp. 2d 1360 (M.D. Ga. 2002).

analysis – "the job duties now deemed by the AI to be non-administrative-exempt sales duties are *the very same duties* that DOL (citing <u>Wilshin</u>) described in its preamble as exempt administrative duties." Pl's. Opp'n at 27 (alteration in original).  Plaintiff is still wrong, for the same reasons as before.

First, there are significant differences between the mortgage loan officers' duties described in the 2010 AI and the duties of the <u>Wilshin</u> employees discussed in the preamble.  For example, nowhere in the 2010 AI is a typical loan officer described as being "required to represent his employer in the market," 69 Fed. Reg. at 22145, AR at 32, a crucial duty for the neighborhood insurance agents in <u>Wilshin</u>, 212 F. Supp. 2d at 1377, who are the public faces of their company.  As the 2010 AI noted, <u>see</u> 2010 AI at 8 n.8, AR at 109, general marketing and promotion of the employer's loan products is a minor aspect of the typical mortgage loan officer's job.  Likewise, there is no indication in the 2010 AI that the typical mortgage loan officer performs anything similar to helping customers with claims as was included in the duties of the insurance agent in <u>Wilshin</u>.

Second, regardless of whether some of the duties performed by the <u>Wilshin</u> agents overlap with some of the duties performed by a typical mortgage loan officer, whether or not the loan officer is administratively exempt necessarily turns on whether his primary duty is sales.  That determination does not take place in a vacuum, but requires an examination of why an employee performs certain duties, such a recommending products to customers, in the light of his work as a whole.  Are certain duties merely a part of the necessary work done to make sales possible?  If that is the case, as with the typical mortgage loan officer, then the employee cannot be administratively exempt.  This analysis, properly employed in the 2010 AI, is entirely

16

consistent with <u>Wilshin</u>, the other cases discussed in the preamble,[17] and the 2004 regulations as

a whole.

**C.      The 2010 AI and the 2004 Regulations Apply the Same "Primary Duty" Analysis**

Fundamentally, Plaintiff refuses to accept the key distinction between an employee whose

duties *involve* sales versus an employee whose *primary duty* is sales.  The 2004 regulations were

careful to draw this line, contrasting <u>Wilshin</u>, <u>John Alden</u> and <u>Hogan</u> with <u>Casas</u>,[18] to illustrate it.

As the 2004 regulations explained, to ascertain whether the administrative exemption applies,

one must examine an employee's duties and responsibilities to determine whether (1) the

employee engages in some sales work, but spends the majority of his time serving the business

itself, or (2) the employee's primary duty is sales, and he engages in various duties to further that

ultimate goal.  <u>See</u> 69 Fed. Reg. at 22145-46, AR at 32-33.  The 2010 AI echoed this important

distinction, and used it to determine that loan officers were not administratively exempt.  <u>See</u>

2010 AI at 4, AR at 105.  By contrast, MBA repeatedly urges the Court to examine each duty

_____

[17] Calling <u>Wilshin</u> the "key case relied upon by DOL in its regulatory preamble," Pl.'s. Opp'n at 27, is somewhat baffling.  <u>Wilshin</u> is one of three insurance agent cases that are illustrative of exempt financial service employees – nothing in the preamble identifies this decision as any more important than the other two: <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1 (1st Cir. 1997) and <u>Hogan v. Allstate Insurance Co.</u>, 361 F.3d 621 (11th Cir. 2004).  Similarly inexplicable is MBA's accusation that "Defendants repeatedly attempt to distinguish <u>Wilshin</u> and <u>Hogan</u> . . . by referring to them as the 'insurance agent cases,'" which allegedly entails a "singular focus on job titles" in violation of the 2004 regulations.  <u>See</u> Pl.'s. Opp'n at 28 n.32. Defendants simply referred to <u>Wilshin</u>, <u>John Alden</u> and <u>Hogan</u> as the "insurance agent cases" in the interest of simplicity—they are all cases that involve employees in the insurance industry.  As Defendants previously acknowledged, "a job title alone does not establish exempt status.  <u>See</u> 29 C.F.R. § 541.2.  Rather, an employee's salary and duties determine the employee's exempt or non-exempt status."  Defs'. Cross Mot. to Dismiss or, in the Alternative, for Summ. J. at 4 n.3.

[18] <u>Casas v. Conseco Fin. Corp.</u>, No. Civ. 00-1512 (JRT/SRN), 2002 WL 507059 (D. Minn. Mar. 31, 2002).

performed by a loan officer as if it exists wholly apart from his other duties.  But "defining

'primary duty' in the manner proposed by [MBA] would be in deep conflict with the regulatory

framework of the FLSA" because restricting the definition of sales solely to the time spent doing

customer-specific persuasive sales activity, and excluding the necessary work done to make those

sales possible, would be contrary to the plain meaning of the "primary duty" regulation, which

prohibits such a "missing-the-forest-for-the-trees approach[.]"  See Attachment 1, Henry v.

Quicken Loans, Inc., No. 2:04-cv-40346-SJM-MJH, slip op. at 2-3 (E.D. Mich. Jan. 27, 2011).

Or, put another way, MBA's approach is divorced from reality.  See, e.g., id. ("[I]f Willy

Loman's work day had been sliced up in such detail, even Arthur Miller might not have

recognized him as a salesman.") (quotation omitted).

      In addition, MBA again criticizes DOL's usage of the portion of the 2004 regulations that

defines the outside sales exemption (29 C.F.R. §§ 541.500-541.504) to help determine whether

mortgage loan officers were administratively exempt.  Pl's. Opp'n at 28-33; Mem. in Supp. of

Pl's. Mot. for Summ. J. at 31-33.  But as Defendants previously explained, in analyzing whether

a typical mortgage loan officer's primary duty is sales, the 2010 AI identified several factors as

relevant to that inquiry, all of which pointed to sales as the mortgage loan officer's primary duty:

the compensation methods historically used for mortgage loan officers; the focus of employers'

mortgage loan officer training and the basis for evaluating their performance; the fact that courts

have repeatedly found mortgage loan officers have a primary duty of sales and the

characterization of mortgage loan officers by employers themselves (i.e., MBA's members) in

cases where employers have sought to claim the outside sales exemption for mortgage loan

officers.  See 2010 AI at 5-6, AR at 106-07.[19]  As part of this analysis, the 2010 AI also looked to

the factors that are considered under the outside sales exemption in determining whether an

employee's primary duty is making sales.  See id. at 4-5, AR at 105-06.  This thoughtful

approach, lauded by another District Court as "instructive,"[20] encourages consistency within a

regulatory scheme and was in no way arbitrary and capricious.

> **D.**     **Casas Is Both a Key Underpinning of the 2010 AI and Tellingly Absent from the 2006 Opinion Letter**

    Having conspicuously omitted any discussion of Casas in its opening brief, MBA

dedicates just four paragraphs at the conclusion of its 38 page opposition to this vital case.

Unable to deny the case's central importance, given its prominent role in the preamble to the

2004 regulations and its contribution of a key component to § 541.203(b),[21] MBA offers a

---

[19] Plaintiff's submission of a handful of declarations from cherry-picked employees at a couple of banks alleging that some of these factors may not have mirrored their personal experience is an impermissible attempt to supplement the administrative record.  Judicial review of agency action under the APA is generally confined to the administrative record that was before the agency when it made its decision.  See 5 U.S.C. § 706.  The record is comprised of those documents that were before the administrative decisionmaker, Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971), and a court should consider neither more nor less than what was before the agency at the time it made its decision, IMS, P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997).  DOL's submission and certification of the administrative record as filed is entitled to a strong presumption of regularity.  See, e.g., Marcum v. Salazar, 751 F. Supp. 2d 74, 78 (D.D.C. 2010).  Supplementation of administrative record is permitted only in rare circumstances, such as where a plaintiff puts forth concrete evidence that an the agency deliberately or negligently excluded documents, none of which MBA has argued apply here.  See Am. Wildlands v. Kempthorne, 530 F.3d 991, 1002 (D.C. Cir. 2008).  Accordingly, it would be inappropriate for the Court to consider any of these declarations for the purpose of evaluating the merits of DOL's decision.

[20] Again, the Court in Quicken Loans used the same approach in analyzing the meaning of sales.  See Attachment 1 at 20, n.5.

[21] Not to mention the discussion of Casas in Wilshin, which Plaintiff has argued is the key case in this matter.  See Wilshin, 212 F. Supp. 2d at 1377 ("Plaintiff's duties are more extensive

lackluster defense for its glaring absence from the 2006 Opinion Letter.  According to Plaintiff, because the employees in <u>Casas</u> worked in a call center, their duties were "markedly different" from a typical mortgage loan officer's job duties, Pl.'s Opp'n at 35, and in any event, the presence of the call-center environment alone was enough to justify the 2006 Opinion Letter's not addressing the case.

MBA's first point is demonstrably incorrect – the duties of the <u>Casas</u> employees are remarkably similar to those of a typical mortgage loan officer.  The duties of the loan originators in <u>Casas</u> included: (1) calling potential customers, (2) obtaining their financial information, (3) running credit reports, (4) match their employer's loan products to the customers' needs, and (5) assisting with the documents for closing.  <u>See Casas</u>, 2002 WL 507059 at *1.  Similarly, the typical mortgage loan officer's job duties included (1) contacting potential customers, (2) collecting financial information from them, (3) running credit reports, (4) identifying loan programs for which customers qualify and that match the customers' needs, and (5) compiling and finalizing customer documents for closings.  <u>See</u> 2010 AI at 1-2, AR at 102-03.

More importantly, the key point highlighted by the 2004 regulations was not where the employees in <u>Casas</u> worked, but what their primary duty was.  The 2004 regulations recognized that the <u>Casas</u> court had evaluated the loan originators' duties there and concluded their primary duty was sales, just as the <u>John Alden</u>, <u>Hogan</u>, and <u>Wilshin</u> courts had evaluated the employees in those cases and reached the opposite conclusion.  Plaintiff makes the mistake of assuming that the call center environment in <u>Casas</u> makes a difference, but a work address alone no more establishes exempt status than a job title does.  <u>Cf.</u> 29 C.F.R. § 541.2.  Citing <u>Casas</u> and the

_____

and involve more discretion than the loan originators in [<u>Casas</u>].").

20

"production" versus "administrative" dichotomy discussed in the preamble to the 2004

regulations, and distinguishing the mortgage loan officers' work from the insurance agents' work

in John Alden and the other insurance industry cases, the Wage and Hour Division determined

that a mortgage loan officer's primary duty is making sales.  See id. at 3-6, AR at 104-07.  This

conclusion was proper, and stands in clear contrast to the improper analysis in the 2006 Opinion

Letter, which left out any discussion of Casas (among other errors).  See 2010 AI at 5 n.3 & 8,

AR at 106, 109.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's

motion for summary judgment and grant Defendants' motion to dismiss or, alternatively, for

summary judgment.

Date: May 17, 2011

| | |
|---|---|
| TONY WEST<br>Assistant Attorney General | /s/ Peter D. Leary_____<br>PETER D. LEARY<br>Virginia Bar No. 71196 |
| RONALD C. MACHEN, JR.<br>United States Attorney | Trial Attorney, Federal Programs Branch<br>U.S. Department of Justice, Civil Division<br>Tel: (202) 514-3313 |
| FELIX V. BAXTER<br>Director, Federal Programs Branch | Fax: (202) 616-8470<br>E-mail: peter.leary@usdoj.gov |
| JUDRY L. SUBAR<br>Assistant Director,<br>Federal Programs Branch | Mailing Address:<br>Post Office Box 883<br>Washington, D.C. 20044 |

Of Counsel:

M. PATRICIA SMITH
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

JONATHAN M. KRONHEIM
Counsel for Trial Litigation

RACHEL GOLDBERG
Attorney
U.S. Department of Labor

22