**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MORTGAGE BANKERS ASSOCIATION,

Plaintiff,

v.

HILDA SOLIS, Secretary of Labor; NANCY LEPPINK, Acting Wage and Hour Administrator; and THE UNITED STATES DEPARTMENT OF LABOR,

Defendants.

Civil Action No. 11-0073 (RBW)

**MEMORANDUM OPINION**

The plaintiff, the Mortgage Bankers Association ("Association"), seeks declaratory and injunctive relief in this civil lawsuit brought against the defendants, Hilda Solis, in her official capacity as Secretary of the United States Department of Labor ("DOL"), Nancy Leppink, in her official capacity as Deputy Administrator of the Wage and Hour Division of the DOL, and the DOL itself, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (2006). Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 1. Specifically, the plaintiff seeks judicial review of the defendants' issuance of DOL Administrative Interpretation 2010-1 ("2010 AI"), which conflicts with a prior position taken by the DOL. Id. ¶¶ 2, 26-27. Currently before the Court is the Association's Motion for Summary Judgment and the DOL's Cross Motion to Dismiss or, in the Alternative, for Summary Judgment. Upon consideration of the complaint, the

parties' cross-motions, all memoranda of law and the exhibits submitted with the motions, and the administrative record,[1] the Court concludes that it must grant in part and deny in part the DOL's cross-motion and deny the Association's motion for summary judgment.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

This case concerns the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. §§ 201-219 (2006), and the regulations promulgated by the DOL to implement the Act. See Defendants' Cross Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot.") at 1. Enacted by Congress in 1938, Compl. ¶ 14, the FLSA generally requires that covered employers pay overtime wages to their employees who work more than 40 hours per week, unless they are exempted by the Act from this requirement. 29 U.S.C. § 207(a)(1). Section 213(a)(1) of the FLSA provides for such an exemption, stating that "any employee employed in a bona fide executive, administrative, or professional capacity[,] . . . or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary[,] . . .)" is exempt from the "[m]inimum wage and maximum hour requirements" otherwise required by the Act. 29 U.S.C. § 213(a)(1).

The Wage and Hour Division of the DOL ("Wage and Hour Division") is responsible for "administering and enforcing the FLSA, and it periodically issues regulations that define the scope of the FLSA's exemptions and interpretations of those regulations." Defs.' Mot. at 4.

[1] In addition to the documents already identified, the Court considered the following submissions in reaching its decision: (1) the Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."), (2) the Defendants' Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot."), (3) the Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment ("Pl.'s Reply"), and (4) the Defendants' Reply to Plaintiff's Opposition to Defendants' Cross Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Reply").

After the passage of the FLSA, the Wage and Hour Division "promulgated regulations defining and delimiting the FLSA's exemptions from overtime pay requirements." Compl. ¶ 14. Those regulations were most recently amended on August 23, 2004. See Administrative Record ("A.R.") at 8-78 (Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-191 (Apr. 23, 2004) (codified at 29 C.F.R. § 541)). As revised, the regulations state that the administrative exemption of section 213(a)(1) of the FLSA applies to an employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The 2004 regulations were accompanied by a preamble "Summary," which explained that the administrative "exemption is intended to be limited to those employees whose duties relate to the administrative as distinguished from the production operations of a business." 69 Fed. Reg. 22122, 22141 (internal quotation marks omitted). The 2004 regulations also provide examples that illustrate how the administrative duties exemption can be applied to employees in various occupations, including the following example regarding the financial services industry:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b) (entitled "Administrative exemption examples").

**B. Factual and Procedural Background**

1. Pre-2004 Interpretation of the Administrative Exemption

The following facts are not in dispute and are taken from either the Association's complaint or the administrative record filed in this case.

The plaintiff is a national trade association that represents the real estate finance industry. Compl. ¶ 7. The Association "has over 2,200 member companies, including all elements of real estate finance: mortgage companies, mortgage brokers, commercial banks, thrifts, life insurance companies, and others in the mortgage lending field." Id. These companies employ over 280,000 individuals throughout the United States. Id. The Association's primary goals are "to ensure the continued strength of the nation's residential and commercial real estate market, to expand home ownership and extend access to affordable housing to all Americans." Id.

From as early as 1964, and until March 24, 2010, the DOL announced its interpretation of the FLSA through the issuance of "[o]pinion [l]etters." Id. ¶ 15. These opinion letters were written in response to inquiries from private parties seeking guidance about the application of the FLSA to their business activities. Id. Access to the opinion letters was available through several avenues, including, in recent years, electronic legal research databases and the DOL's own website. See id. And as the plaintiff correctly points out, the District of Columbia Circuit has held that "DOL Opinion Letters . . . constitute final agency action subject to judicial review." Id. ¶ 16 (citing Nat'l Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689, 701-02 (D.C. Cir. 1971) (holding that although the opinion letters lack formality, they are intended as a "deliberative determination of the agency's position" and thus are subject to judicial review)).

The administrative record in this case contains two opinion letters issued by the DOL prior to the 2004 amendment of its regulations. The first, dated July 23, 1997, discussed whether a wholesale salesman is exempt from the FLSA's overtime requirements. A.R. at 1-3 (Opinion Letter, 1997 WL 970727 (DOL WAGE-HOUR)). This opinion letter concluded that "[t]he decisions of wholesale salesmen typically do not involve matters of policy or significant importance, but are limited to routine day-to-day operational matters." Id. at 2-3. While the Wage and Hour Division did not come to an ultimate conclusion on the exemption question, the opinion letter suggested that wholesale salesmen are not covered by the administrative exemption.[2] Id. The second pre-2004 opinion letter found in the administrative record, dated May 17, 1999, determined that "loan officers are engaged in carrying out the employer's day-to-day activities rather than in determining the overall course and policies of the business" and were therefore non-exempt employees entitled to overtime. See id. at 5 (Opinion Letter, 1999 WL 1002401 (DOL WAGE-HOUR) ("1999 Opinion Letter")).

Effective August 23, 2004, the DOL amended its regulations interpreting the wage and hour requirements set forth by the FLSA. Compl. ¶ 21. As noted earlier, the amended regulations, as they pertain to the financial service industry, provide:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee

[2] If the party does not provide the DOL with sufficient facts regarding the nature of their inquiry, the DOL will not provide an ultimate conclusion; rather, it will state what set of facts would need to exist in order for the employee to be exempt. See generally Defs.' Mot. at 11-12 (citing A.R. at 87-93 (Opinion Letter FLSA2006-31 ("2006 Opinion Letter"))) (providing an opinion that an employee would be exempt if the assumptions provided by the requestor and other relevant facts are true).

> whose primary duty is selling financial products does not qualify for the administrative exemption.

Id. (citing 29 C.F.R. § 541.203(b)). And as already noted, the amended regulations included a preamble, id. ¶ 22, which makes it clear that "many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to consumers." 69 Fed. Reg. at 22146.

2. The 2006 Opinion Letter

On September 8, 2006, the DOL issued an opinion letter to the Association ("2006 Opinion Letter"), see A.R. at 87-93 (Opinion Letter FLSA2006-31 ("2006 Opinion Letter")), at the Association's request. Defs.' Mot. at 11 n.6.[3] In requesting the letter, the Association asked the DOL to assume that the mortgage loan officers who were the subject of the letter spent less than fifty percent of their working time on "customer-specific persuasive sales activity." Id. at 11-12 (internal quotation marks and citation omitted). The 2006 Opinion Letter began by reminding the Association that an employee's exempt status is "determined by analyzing each particular employee's actual job duties and compensation under the applicable regulations." A.R. at 87 (2006 Opinion Letter).

The Association also asked whether the DOL's analysis of the administrative exemption was altered by the 2004 regulations. Id. at 88-89. In response, the DOL noted that "[b]ecause the criteria in the duties test for the administrative exemption in the 2004 revised final regulations are substantially the same as under the prior rule, the outcome of this opinion would be essentially identical under either version of the regulations." Id. at 89 (citation omitted).

[3] Generally, the DOL does not release the name of the requestor for an opinion letter. Defs.' Mot.. at 11 n.6. However, the Association has acknowledged that it requested the 2006 opinion letter. Id.

The 2006 Opinion Letter reinforced that the 2004 revised regulations made the administrative exception applicable to employees when their employment satisfied the following three components:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . ., exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

Id. (citation omitted). With regard to the second prong of this test, the letter defined "[w]ork that is 'directly related to the management or general business operations' of the employer . . . as 'work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.'" Id. (citation omitted). As to the third component of the test, the term "primary duty" is defined in the letter as "the principal, main, major or most important duty that the employee performs." Id. (quoting 29 C.F.R. § 541.700(a)). The letter explained that the amount of time an employee spends performing exempt work is a factor to consider in assessing the applicability of the exemption, but time alone "is not the sole test." Id. (quoting 29 C.F.R. § 541.700(b)).

The 2006 Opinion Letter further noted that although employees whose primary duty involves sales cannot qualify for the administrative exemption, many financial services employees could and had been found to fall under this exemption. Id. at 90 (citing 29 C.F.R. § 541.700(b)). Accordingly, the DOL concluded that the loan officers who were the subject of the 2006 Opinion Letter

> ha[d] a primary duty other than sales, as their work include[d] collecting and analyzing a customer's financial information, advising the customer about the

> risks and benefits of various mortgage loan alternatives in light of their individual financial circumstances, and advising the customer about avenues to obtain a more advantageous loan program.

Id. at 90-91. The letter concluded that "the use of software programs or tools to assess risk and to narrow the scope of products available to the customer does not necessarily disqualify the employees from the administrative exemption for lack of discretion and independent judgment." Id. at 91. Finally, the letter noted that its "opinion [was] based exclusively on the facts and circumstances described in [the Association's] request and is given based on [the Association's] representation, express or implied, that [the Association] ha[d] provided a full and fair description of all the facts and circumstances that would be pertinent to [the DOL's] consideration of the question presented." Id. at 93.

According to the Association, relying on the 2006 Opinion Letter, many members of the financial services industry, including many of the Association's members, classified mortgage loan officers as exempt employees. Compl. ¶ 24. Thus, mortgage loan officers were not compensated with overtime pay. Id. ¶ 25. Rather, the members of the Association ensured that their mortgage loan officers were well compensated through other means, like competitive salaries, bonuses, and commissions. Id.

3. The 2010 Administrative Interpretation

On March 24, 2010, the DOL, "sua sponte," issued an Administrative Interpretation, the 2010 AI, expressly withdrawing the 2006 Opinion Letter. Id. ¶ 26. Nancy Leppink, Acting Administrator of the Wage and Hour Division, issued the 2010 AI. See A.R. at 102 (U.S. Department of Labor, Administrator's Interpretation No. 2010-01 ("Administrator's Interpretation No. 2010-01")). The 2010 AI focuses on "[w]hether the primary duty of employees who perform the typical job duties of a mortgage loan officer is office or non-manual

work directly related to the management or general business operations of their employer or their employer's customers." Id. at 103.  The 2010 AI expressed that to qualify for the exemption, an employee's "[w]ork [must be] directly related to management or general business operations of an employer[, which] includes work in functional areas such as accounting, budgeting, quality control, purchasing, advertising, research, human resources, labor relations, and similar areas." Id. (citation omitted).   In essence, the 2010 AI states that the administrative exemption was designed for "employees whose work involves servicing the business itself[.]" Id. at 104.

The 2010 AI relies on a District of Minnesota decision, Casas v. Conseco Finance Corp., No. Civ.00-1512, 2002 WL 507059 (D. Minn. March 31, 2002) in addition to several other cases, as support for its position that mortgage loan officers are non-exempt employees.  Id. at 105.  In Casas, loan originators asserted they were entitled to overtime compensation from the defendants under the FLSA, requiring the court to decide whether the plaintiffs were exempt from FLSA overtime pay provisions.  The court found that because "Conseco's primary business purpose [was] to design, create and sell home lending products," the mortgage loan officers' primary duty was to sell those lending products on a day-to-day basis, not "'the running of [the] business [itself]' or determining its overall course or policies."  Casas, 2002 WL 507059, at *9 (citation omitted) (alterations in original).  Relying on the ruling in Casas, the 2010 AI reasons that "because Conseco's loan officers' duties were 'selling loans directly to individual customers, one loan at a time,'" the administrative exemption did not apply to them.  A.R. at 105 (Administrator's Interpretation No. 2010-01) (internal citation omitted).  The 2010 AI further notes that the 2004 amended regulations examined the difference between mortgage loan officers who spend the majority of their time selling mortgage products to consumers, like the Casas plaintiffs, as compared to those who "promot[e] the employer's financial products generally,

decid[e] on an advertising budget and techniques, run[] an office, hir[e] staff and set[] their pay, service[] existing customers . . . , and advis[e] customers." Id. at 105 (citing 69 Fed. Reg. at 22145-46). The 2010 AI concluded that in order for mortgage loan officers to be properly classified as exempt employees, their primary duties must be administrative in nature. Id. at 105.

Relying on the facts that a significant portion of mortgage loan officers' compensation is composed of commissions from sales, that their job performance is evaluated based on their sales volume, and that much of the non-sales work performed by the officers is completed in furtherance of their sales duties, the 2010 AI concluded "that a mortgage loan officer's primary duty is making sales." Id. at 106-07. And because their primary duty is making sales, the 2010 AI further concludes that "mortgage loan officers perform the production[, not the administrative,] work of their employers." Id. at 107.

After concluding that the work of mortgage loan officers is not related to the general business operation of their employers, the 2010 AI considered another factor that could provide the basis for finding that mortgage loan officers are subject to the administrative exemption. Id. at 108. The AI states that "[t]he administrative exemption can also apply if the employee's primary duty is directly related to the management or general business operations of the employer's customers." Id. In making this assessment, the 2010 AI notes that "it is necessary to focus on the identity of the customer." Id. The 2010 AI finds that "work for an employer's customers does not qualify for the administrative exemption where the customers are individuals seeking advice for their personal needs, such as people seeking mortgages for their homes." Id. However, it recognizes that a mortgage loan officer "might qualify under the administrative exemption" if the customer that the officer is working with "is a business seeking advice about, for example, a mortgage to purchase land for a new manufacturing plant, to buy a building for

office space, or to acquire a warehouse for storage of finished goods." Id. Nevertheless, the 2010 AI concludes that the typical mortgage loan officers' "primary duty is making sales for the employer [to homeowners], and because homeowners do not have management or general business operations, a typical mortgage loan officer's primary duty is not related to the management or general business operations of the employer's customers." Id. at 109.

Finally, the 2010 AI took exception with the 2006 Opinion Letter's apparent assumption "that the example provided in 29 C.F.R. § 541.203(b) creates an alternative standard for the administrative exemption for employees in the financial services industry." Id. Rather, the 2010 AI states that 29 C.F.R. § 541.203(b) merely illustrates an example of an employee who might otherwise qualify for the exemption based on "the requirements set forth in 29 C.F.R. § 541.200." Id. Thus, the 2010 AI clarifies that "the administrative exemption is only applicable to employees that meet the requirements set forth in 29 C.F.R. § 541.200." Id. In providing this clarification, the 2010 AI states, "[t]he fact example at 29 C.F.R. § 541.203(b) is not an alternative test, and its guidance cannot result in it 'swallowing' the requirements of 29 C.F.R. § 541.200."[4] Id.

In summation, the DOL through the issuance of the 2010 AI explicitly withdrew the 2006 Opinion Letter "[b]ecause of its misleading assumption and selective and narrow analysis[.]" Id. Before taking this action, the DOL did not utilize the APA's notice and comment process. Compl. ¶¶ 32-33.

Following the issuance of the 2010 AI, the Association filed its Complaint in this case on January 12, 2011, asserting that the DOL violated the APA by issuing the 2010 AI. Id. ¶¶ 36-52.

[4] The 2010 AI also "expressly withdrew . . . 2001 Opinion Letter." Pl.'s Mem. at 13; Defs.' Mot. at 14 ("[T]he Wage and Hour Division withdrew the 2001 Opinion Letter as inconsistent with the analysis in the 2010 AI, inasmuch as it had erroneously concluded that mortgage loan officers performed work that was directly related to the management or general business operations of the employer or the employer's customers.").

First, the Association argues that "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." Id. ¶ 36 (citing Paralyzed Veterans of Am. v. D.C. Arena, 117 F.3d 579, 586 (D.C. Cir. 1997)). Second, the Association argues that "[b]ecause the AI conflicts with existing DOL regulations, and because those regulations have been afforded the force of law by courts, DOL's issuance of the 2010 AI is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." Id. ¶ 50. The Association seeks to have the 2010 AI "[v]acat[ed] and set aside" and the defendants "[e]njoin[ed] and restrain[ed] . . . from enforcing, applying, or implementing . . . the AI." Id. at 12 (Prayer for Relief).[5]

The Association filed its Motion for Summary Judgment simultaneously with the Complaint. In response, the DOL has filed a Cross Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment.[6]

## II. STANDARD OF REVIEW

The DOL has moved for dismissal under Federal Rule of Civil Procedure Rule 12(b)(6), and alternatively moves for summary judgment under Rule 56. Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. [And if the motion is considered under Rule 56, a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Here, because both parties have presented materials outside the pleadings (namely, the administrative record)

[5] The Association also seeks an award of its litigation costs and attorney's fees. These requests are not addressed in this opinion.

[6] In resolving these motions, the Court also considered the memorandum of law submitted on behalf of the three intervenors, Ryan Henry, Beverly Buck, and Jerome Nichols.

for the Court to consider in adjudicating their motions, the Court deems it appropriate to treat both submissions as motions for summary judgment. See Marshall Cnty. Health Care. Auth. v. Shalala, 988 F.2d 1221, 1226 & n.5 (D.C. Cir. 1993) (noting that a district court considering a Rule 12(b)(6) motion "can consult the [administrative] record to answer the legal question[s] before the court," but that "[i]t is probably the better practice for a district court always to convert to summary judgment").

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); see also Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977). However, due to the limited role of a court in reviewing the administrative record, the typical summary judgment standards set forth in Rule 56(c) are not applicable. Stuttering, 498 F. Supp. 2d at 207 (citation omitted). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)).

A reviewing court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Ludlow v. Mabus, 793 F. Supp. 2d 352, 354 (D.D.C. 2011) (quoting 5 U.S.C. § 706(2)(A) (2006)). In Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Automobile Insurance Co., the Supreme Court explained the "arbitrary and capricious"

review by noting that "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 463 U.S. 29, 43 (1983). However, the "standard of review is a narrow one." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). "The court is not empowered to substitute its judgment for that of the agency." Id. "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof," San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n, 789 F.2d 26, 37 (D.C. Cir. 1986), and the APA directs a reviewing court to "review the whole record or those parts of it cited by a party" in making this assessment, 5 U.S.C. § 706.

## III. ANALYSIS

The plaintiff seeks relief based on two distinct theories. First, relying on Paralyzed Veterans, 117 F.3d at 586, the plaintiff argues that once an agency issues an authoritative interpretation of its own regulation, it must utilize the notice and comment process if it desires to modify that interpretation. Compl. ¶ 36. Second, the plaintiff argues that the 2010 AI does not comport with the 2004 regulations and is therefore "arbitrary, capricious, an abused of discretion, and otherwise not in accordance with law." Compl. ¶ 50. The Court will analyze each argument in turn.[7]

[7] The Court notes that the plaintiff contends, and, in fact, takes the position that the 2010 AI is an "interpretation of [the Agency's] own regulation[], as it was signed by the Administrator of the Wage and Hour Division, published on DOL's website, and held out to employees as guidance for complying with the FLSA." Pls.' Mem. at 1. The defendants do not take exception with this position, indeed, they endorse it. Specifically the defendants state, "the 2010 interpretation corrected a short-lived 2006 issuance," Defs.' Mem. at 1 (emphasis added), and further concedes that it cannot be construed as a legislative rule, see id. at 14-16, 16 n.9 (stating that the 2010 AI is an interpretive rule as opposed to substantive rule, and therefore, notice and comment is not necessary). The Court agrees that the 2010 AI is an interpretive rule and will accordingly conduct its analysis from that perspective.

**A. The Paralyzed Veterans and Alaska Professional Hunters Cases**

It is well established that there is "no barrier to an agency altering its initial interpretation to adopt another reasonable interpretation—even one that represents a new policy response generated by a different administration." Paralyzed Veterans, 117 F.3d at 586 (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 863 (1984)). However, the District of Columbia Circuit has held that "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." Id. at 586; Transp. Workers Union of Am. v. Transp. Sec. Admin., 492 F.3d 471, 475 (D.C. Cir. 2007) ("[A]n agency cannot significantly change its position, cannot flip-flop, even between two interpretive rules, without prior notice and comment.").

The District of Columbia Circuit had the opportunity to reexamine its holding in Paralyzed Veterans in Alaska Professional Hunters Ass'n v. FAA, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999). Alaska Professional Hunters concerned an interpretation by the Federal Aviation Administration ("FAA") that several provisions of its regulations that "applied to (among others) 'commercial operator[s]'" did not "govern guide pilots whose flights were incidental to their guiding business and were not billed separately." Id. at 1031. The FAA's position was based on its reading of the Civil Aeronautics Board's decision in Administrator v. Marshall, 39 C.A.B. 948 (1963). Id. "Although the [agency] never set forth its interpretation of [the several regulations at issue] in a written statement," the parties "agree[d] that [the] FAA personnel in Alaska consistently followed the interpretation in official advice to guides and guide services." Id. at 1031-32.

In January 1998, the FAA reversed course and published a "Notice to Operators" that "required the[] guide pilots to abide by FAA regulations applicable to commercial air operations." Id. at 1030. Drawing on its decision in Paralyzed Veterans, 117 F.3d at 586, the Circuit found that this modification of the FAA's longstanding policy exempting the guide pilots from the FAA regulations mandated the use of notice and comment rulemaking. Id. at 1035-36. The Circuit concluded that "current doubts about the wisdom of the regulatory system followed in Alaska for more than thirty years does not justify disregarding the requisite procedures for changing that system." Id. at 1035.

      1.      Is Paralyzed Veterans still good law?

The defendants argue that two Supreme Court cases conflict with Paralyzed Veterans and Alaska Professional Hunters. Defs.' Mot. at 15-17. First, they argue that Paralyzed Veterans cannot be reconciled with the holding in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524 (1978). Defs.' Mot. at 15-17. In Vermont Yankee, the Supreme Court reiterated its previous conclusion "that generally speaking," the APA's notice and comment requirements "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." Vermont Yankee, 435 U.S. at 524. The Supreme Court further stated that "[a]gencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose [additional procedural requirements] if the agencies have not chosen to grant them." Id. (emphasis added). The defendants argue that this limitation imposed on courts by Vermont Yankee conflicts with the requirements imposed by Paralyzed Veterans; namely, the requirement that an agency must employ the notice and comment process if they wish to change a prior interpretation of their own regulations, Defs.'

Mot. at 16-17, since the Supreme Court observed that only in "extremely rare" circumstances may courts impose "procedures beyond those required by the statute," Vermont Yankee, 435 U.S. at 524; see Defs.' Mot. At 16-17.

This Court is "obligated to follow controlling [C]ircuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule it." United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997). Thus, even if this Court "disagree[d] with circuit precedent" its "obligation" to follow such precedent would not be relieved. Id. Moreover, having been decided nearly twenty years before Paralyzed Victims, the District of Columbia Circuit was presumably aware of the existence of Vermont Yankee when it authored its opinion in Paralyzed Veterans. And this Court is not prepared to find that the Circuit disregarded Supreme Court precedent when it decided Paralyzed Victims.

The defendants are correct in stating that seven courts of appeals have held that the notice and comment provisions found in section 553 of the APA do not apply to interpretative rules. Defendants' Reply to Plaintiff's Opposition to Defendants' Cross Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Reply") at 9. However, this Circuit, in deciding Paralyzed Veterans, Alaska Professional Hunters, and other cases that have addressed the same subject, see, e.g., Kelley v. EPA, 15 F.3d 1100, 1108 (D.C. Cir. 1994); Am. Mining Cong. v. MSHA, 995 F.2d 1106, 1109 (D.C. Cir. 1993), has ruled that if an interpretation of a statute or rule "itself carries the force and effect of law," Paralyzed Veterans, 117 F.3d at 588 (quotation marks and citations omitted), the agency is required to use notice and comment procedures. And this Court had the occasion to apply Paralyzed Veterans in a case with similarities to this case. See Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 337 F. Supp. 2d. 1, 13 (D.D.C. 2004), rev'd on other grounds, 437 F.3d 75 (D.C. Cir. 2006) (Walton, J.)

("[B]efore the [agency] could alter[] its earlier interpretation of the [regulation], it was required to undertake notice-and-comment rulemaking as required by the APA[.]"). Thus, this Court cannot, and will not, find that Vermont Yankee commands that it refuse to follow a Circuit case that was decided two decades later, and has remained good law in this Circuit for almost fifteen years.

Second, the DOL argues that Paralyzed Veterans and Alaska Professional Hunters were overturned by the recent Supreme Court decision in FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009). The DOL relies on language from Fox Television, stating that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." Defs.' Mot. at 15 (quoting Fox Television, 556 U.S. at 515). Fox Television concerned two television live broadcasts during which expletives were used, resulting in the Federal Communication Commission's ("FCC") issuance of two "[n]otices of [a]pparent [l]iability" based on the FCC's finding that the two occurrences were "actionably indecent." 556 U.S. at 508-512. Prior to the commission of these two incidents, the FCC had permitted networks to broadcast "fleeting" expletives without punishment. Id. The FCC reversed course with regard to the two incidents in question, finding that the broadcasts were indecent, even though both contained only "fleeting" expletives. Id. at 512, 530. The Second Circuit found that the FCC's decision changing its policy was not in compliance with the APA due, in part, to its failure to provide an adequate reason for the change. Id. at 513-514; see 5 U.S.C. § 706(2)(A). On review of that ruling, the Supreme Court rejected the Second Circuit's position, "find[ing] no basis in the [APA] or in [its] opinions for a requirement that all agency change be subjected to more searching review." Fox Television, 556 U.S. at 514.

The language in Fox Television which the defendants contend invalidates Paralyzed Veterans, when considered in conjunction with the entire majority opinion in Fox Television, implicates the APA's arbitrary and capricious review, not its notice and comment process.  In fact, the Supreme Court made perfectly clear the question it was addressing, holding that "we find the [FCC's] orders neither arbitrary nor capricious."  Id. at 530.  So what the defendants are seeking to do is have this Court expand the reach of Fox Television beyond the question the Supreme Court actually addressed.  That, this Court cannot do, as the Fox Television decision has no bearing on whether an agency must employ the notice and comment process before changing its policies.  The answer to that question requires this Court to look to Paralyzed Veterans and its progeny, in the absence of en banc Circuit authority or Supreme Court repudiation of those decisions.  Torres, 115 F.3d at 1036.  Neither has occurred, so Paralyzed Veterans and its line of cases remains controlling authority in this Circuit.

    2.      The Paralyzed Veterans Doctrine and Alaska Professional Hunters Rationale

Having determined that Paralyzed Veterans remains controlling authority in this Circuit, the Court must now turn its attention to the exceptions to Paralyzed Veterans, which the defendants contend have been recognized by the Circuit and are relied upon by the defendants in this litigation.  As the alternative position to their argument that this Court should not follow Paralyzed Victims, the defendants argue that these two purported exceptions to the applicability of Paralyzed Veterans weigh in favor of granting them summary judgment.  First, they contend that MetWest Inc. v. Secretary of Labor, 560 F.3d 506 (D.C. Cir. 2009), alleviates the requirement of utilizing notice and comment when a party did not "substantially and justifiably" rely upon an earlier agency interpretation.  Defs.' Mot. at 22-26.  Second, the defendants argue

that the "invalid prior interpretation" exception purportedly recognized in Monmouth Med. Ctr. v. Thompson, 257 F.3d 807 (D.C. Cir. 2001), applies here. Id. at 18-22.

The MetWest case raised the question of whether MetWest could "be held liable for violating a regulation governing the removal of needles from equipment used to extract blood." 560 F.3d at 507-508. Dating back to 1991 when the needle removal regulation was adopted, the Occupation, Safety and Health Administration ("OSHA") "declined to enforce [the regulation] against employers who supplied their employees with reusable blood tube holders." Id. at 508-09. In October 2003, OSHA changed its policy through the issuance of a "guidance document," which stated that the use of reusable blood holders "likely violated" the regulation. Id. at 509. MetWest brought suit following the change, arguing that the agency was required to employ notice and comment rulemaking before altering its interpretation of the needle removal regulation. Id.

The Circuit in MetWest reiterated that its holding in Alaska Professional Hunters was "that an agency's practice of advising affected entities—in a prior agency adjudication and the consistent advice of agency officials over a 30-year period—that a regulation did not apply to them established 'an authoritative departmental interpretation' that could not be changed without notice and comment." Id. at 511 (citation omitted).[8] The MetWest court emphasized that "[a] fundamental rationale of Alaska Professional Hunters was the affected parties' substantial and justifiable reliance on a well-established agency interpretation." Id. (emphasis added). The Circuit noted that "[t]his is a crucial part of the analysis" and that "[t]o ignore it is to misunderstand Alaska Professional Hunters to mean that an agency's initial interpretation, once informally adopted, freezes the state of agency law, which cannot subsequently be altered

[8] The MetWest opinion was authored by Judge Raymond Randolph, who also authored the Alaska Professional Hunters opinion.

without notice-and-comment rule-making." Id. at 511 n.4 (citations and internal quotation marks omitted). And in Alaska Professional Hunters, notice and comment rulemaking was deemed necessary before an interpretation of a regulation could be changed, because, in that case, people had moved to Alaska and started businesses with the understanding that an agency's regulations did not apply to an essential component of their operations due to the position the agency had taken over a 30-year period. Id. at 511 (citing Alaska Professional Hunters, 177 F.3d at 1035 (alterations in original)). Concluding that "[t]he situation [in MetWest was] not comparable" to the situation in Alaska Professional Hunters, MetWest's challenge to the Agency action was rejected because "OSHA never established an authoritative interpretation of its regulation on which MetWest justifiably relied to its detriment." Id.

The plaintiff takes exception to the defendants' claim that MetWest limits the applicability of Paralyzed Veterans to cases where a "party's reliance upon a prior interpretation [of an agency's regulation] was both substantial and justifiable." Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment ("Pl.'s Reply") at 15 (internal quotation marks omitted). The plaintiff argues that "some new reliance exception to Paralyzed Veterans" was not created by MetWest because "MetWest's discussion of substantial and justifiable reliance was in the content of assessing whether an informal interpretation by [OSHA] could even be an authoritative departmental interpretation" Id. (internal quotation marks omitted).

While it is true that the court in MetWest noted that the agency "never established an authoritative interpretation of its regulation on which MetWest justifiably relied to its detriment," the court's holding was not grounded solely on that fact. MetWest, 560 F.3d at 511. Rather, the ruling of the circuit was also based on the assessment of whether there had been "substantial and

justifiable reliance on a well-established agency interpretation" by MetWest, which was essential to imposing the notice and comment obligation on the agency.  Id. (emphasis added).  So regardless of whether MetWest carved out an exception to Paralyzed Veterans or just clarified what the court intended to convey when it said in Alaska Professional Hunters that the plaintiffs there had "relied" on the agency's initial interpretation, 177 F.3d at 1035, this Court is convinced that MetWest intended to set the bar for what a plaintiff must establish to satisfy the reliance component of the Paralyzed Veterans doctrine.

The plaintiff argues alternatively that even if MetWest did add a substantial and justifiable reliance component to the Paralyzed Veterans doctrine, they "quite plainly relied, substantially and justifiably so, on the 2006 Opinion Letter."  Pl.'s Reply at 17.  The Association relies in part upon the Portal-to-Portal Act of 1947 for this position, id. at 17-25, which gives employers a complete defense to liability if they rely in good faith on the opinion of the Administrator of the Wage and Hour Division.  This Act states that

> no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay . . . overtime compensation under the [FLSA], if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation . . . ."

29 U.S.C. § 259(a) (2006).  In a footnote, the plaintiff points to a number of other trade associations that have been sued since the issuance of the 2010 AI, and purportedly relied upon the 2006 Opinion Letter as a defense under 29 U.S.C. § 259(a).  Pl.'s Reply at 19 n.26.  And the plaintiff takes exception to what it claims is the defendants' position that reliance must equate to circumstances analogous to those in Alaska Professional Hunters, opining that "[i]t would thus be quite odd to read the APA as requiring notice and comment only where an industry can demonstrate it will be put out of business."  Id. at 20.  In opposition, the defendants argue that

"[t]he contrast between Alaska Professional Hunters and the present matter is stark." Defs.' Reply at 5. They note that in Alaska Professional Hunters, "people uprooted their lives, moved across the country, and spent 30 years building up an entire industry in particularly substantial and justifiable reliance on an agency interpretation." Id. They further posit that it was precisely this reliance that "stirred the [District of Columbia] Circuit to act." Id. The defendants opine that "at most [the Association] and its members operated under the misapprehension that mortgage loan officers were administratively exempt for four years, and structured their pay systems accordingly, before [the] DOL corrected th[e] error." Id.

The Court agrees with the defendants. As noted above, the MetWest court stressed that a core tenant of the Alaska Professional Hunters decision was "substantial and justifiable reliance on a well-established agency interpretation." MetWest, 560 F.3d at 511. The interpretation allegedly relied upon by the Association and its members here was only in effect for a period of four years, from 2006 to 2010. See A.R. 87-93 (2006 Opinion Letter). Prior to that, the DOL had taken the position that mortgage loan officers were not exempt employees, and were therefore entitled to overtime pay. See, e.g., A.R. 4-5 (1999 Opinion Letter). Unlike the plaintiffs in Alaskan Professional Hunters, here the Association does not allege that any of its members uprooted their families and moved to a new location in search of business opportunities. Pl.'s Reply at 23. Rather, in the words of the Association itself, employees of financial service firms have merely "become accustomed to the freedom to control their own hours and breaks." Id. While the Court appreciates that having to keep accurate time records may impose an additional burden on the Association's members and their employees, the loss of the freedom to control one's work hours and break times is not the kind of "substantial and justifiable reliance" that Alaskan Professional Hunters had in mind, especially when such

reliance was short lived given the many years that the parties had previously relied upon the interpretation that mortgage loan officers were not covered by the administrative exemption.

Further, the argument that the Association makes under the Portal-to-Portal Act actually weakens its overall position. See Pl.'s Reply at 17-18. As the Association points out, the Portal-to-Portal Act provides that, if the employer "proves that the [failure to pay overtime] was in good faith in conformity with and in reliance on any written administrative . . . interpretation," then the employer "shall [not] be subject to any liability or punishment." 29 U.S.C. § 259(a). Thus, assuming this provision applies, the plaintiff could not be said to have relied upon the prior interpretation to its detriment, as its members will not be liable for any damages resulting from the prior interpretation due to their good faith reliance. Id. While the Court need not reach that conclusion, it is at least worth nothing that the Association's invocation of the Portal-to-Portal Act undermines its position that it "substantial[ly] and justifiabl[ly]" relied upon the 2006 Opinion Letter to the level required by the Circuit in MetWest, 560 F.3d at 511.

Having concluded that the association has failed to satisfy the standard for demonstrating reliance recognized in MetWest, the Court need not address the defendants' additional argument that notice and comment was not required for the 2010 AI based on the Circuit's decision in Monmouth, 257 F.3d at 807.

**B. Is the 2010 AI Inconsistent with the DOL's 2004 Regulations?**

The plaintiff argues that even if the 2010 AI was lawfully adopted, it is "inconsistent with the plain language of 29 C.F.R. § 541.203(b)," Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem.") at 26, and thus "it is arbitrary, capricious, and contrary to law," id. at 3. In essence, the plaintiff argues that the work performed by mortgage loan officers discussed in the 2010 AI are identical to the job duties

discussed in 29 C.F.R. § 541.203(b), which provides examples of job duties that are exempt from the FLSA's overtime pay requirement. Pl.'s Mem. at 26-27. 29 C.F.R. § 541.203(b) contemplates that an employee who "collect[s] and analyz[es] information regarding the customer's income, assets, investments or debts," "determin[es] which financial products best meet the customer's needs and financial circumstances," and "advis[es] the customer regarding the advantages and disadvantages of different financial products" might be found exempt under the administrative exemption. In its memorandum submitted in support of its motion, the plaintiff notes that very similar language was used in the 2010 AI, but that in the 2010 AI, the DOL reached a different result in finding mortgage loan officers non-exempt from the FLSA's overtime requirement. Pl.'s Mem. at 26-27.

The DOL does not dispute that the language found in the two documents is similar. Defs.' Reply at 15. However, it contends that the job duties found in 29 C.F.R. § 541.203(b) are merely intended to provide examples of when a financial services employee might be exempt under the administrative exception. Id. The defendants argue that by "[a]pplying the general administrative duties test in § 541.200(a), in conjunction with the financial services example in § 541.203(b)," the 2010 AI came to the conclusion that the mortgage loan officers in question were not exempt from the FLSA's overtime pay requirement. Id. (citing A.R. 105-108 (Administrator's Interpretation No. 2010-01)).[9]

[9] The defendants have offered supplemental authority—Lewis v. Huntington National Bank, No. C211CV0058, 2012 WL 765077 (S.D. Ohio Mar. 12, 2012)—as additional support for their position that the 2010 AI is not arbitrary and capricious. See Defendants' Notice of Supplemental Authority. Although the case is distinguishable from this case for a variety of reasons, the Southern District of Ohio did find that "because the [2010 AI] applies the test set forth in § 541.200(a), consistently with the example contained in § 541.203(b), there can be no serious argument that [the 2010 AI] was either erroneous or inconsistent with the 2004 revised regulations." Lewis, No. C211CV0058, 2012 WL 765077 at 32 (S.D. Ohio Mar. 12, 2012).

The Court finds the DOL's argument persuasive. The administrative exemption of 29 C.F.R. § 541.200, entitled "General rule for administrative employees," provides in part that an "employee employed in a bona fide administrative capacity" is one "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). The language relied upon by the plaintiff is found in 29 C.F.R. § 541.203(b), which is entitled "Administrative exemption examples," and it provides, in part, that "[e]mployees in the financial services industry generally meet the duties requirements for the administrative exemption . . . . However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption." 29 C.F.R. § 541.203(b) (emphasis added). On its face, and considering the title of the provision, it is clear that § 541.203(b) was intended to provide examples, not an alternative test for the applicability of the administrative exception. Id. Thus, while financial services employees who perform the duties listed in § 541.203(b) are "generally" able to qualify for the administrative exemption, the DOL is still tasked with determining whether specific employees' "primary duty is selling financial products." Id. If so, the employee "does not qualify for the administrative exemption." Id. Given the DOL's reasoning for why the exemption does not apply here, the Court must find that the 2010 AI is not inconsistent with the 2004 regulations; thus, the 2010 AI is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.[10]

---

[10] The Court is aware that there is currently a dispute between the defendants and the intervenors as to whether the 2010 AI applies both prospectively and retroactively. In resolving this case, however, the Court need not reach a conclusion on that issue, as the intervenors, the plaintiff, and the defendants acknowledge. See Intervenors' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Motion to Dismiss at 31-32 n.12; Defendants' Reply to Intervenors' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Motion to Dismiss at 1; Plaintiff's Reply in Support of its Motion for Summary Judgment (Response to Intervenors filed on March 14, 2012) at 3. The Court agrees with the parties and, therefore, declines to address the issue.

## IV. CONCLUSION

The Association has failed to satisfy the Paralyzed Veterans doctrine of substantial and justifiable reliance, which was also recognized in MetWest; thus, both their arguments as to reliance and as to notice and comment procedures must fail. Further, § 541.203(b) was not intended to serve as an alternative test for the applicability of the administrative exception. As such, the 2010 AI is not inconsistent with the 2004 regulations and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Accordingly, the Court must grant in part and deny in part the Defendants' Cross-motion to Dismiss or, in the Alternative for Summary Judgment and deny the Plaintiff's Motion for Summary Judgment.

**SO ORDERED**.[11]

REGGIE B. WALTON
United States District Judge

[11] The Court will issue an Order contemporaneously with this Memorandum Opinion.